UNITED STATES *v.* KANE.

*(District Court, D. Oregon. January 26, 1884.)*

1. OBSTRUCTING THE PASSAGE OF THE MAIL.

The defendant and others, discharged railway laborers, to the number of 150, assembled at Pendleton, Oregon, and by threats of violence prevented the daily train of the Oregon Railway & Navigation Company, including the mail car with the United States mail therein, from proceeding to Portland, because the conductor would not permit them to ride thereon to Portland free of charge, on the ground that they had no money and the company having "passed them up," ought to "pass them down;" and for the same reason and by the same means prevented the conductor from detaching said mail car from said train and sending it to Portland with the United States mail therein. *Held* that, whether the company was under any legal obligation to carry the defendant to Portland free of charge or not, he had no right to prevent the conductor from sending the mail car on to Portland, as he did; and that the conduct of the defendant and his associates being unlawful and necessarily causing the passage of the mail to be obstructed, the law imputes to him an intention, whatever the primary purpose of his conduct was, to cause such obstruction, and, therefore, he is guilty of obstructing and retarding the passage of the mail, contrary to section 3995 of the Revised Statutes.

2. PASSENGER ON TRAIN.

A person who is entitled to travel on a railway car may go upon the same peacefully, and remain therein until he arrives at his destination; and if the conductor undertakes to put him off, on the ground that he is not entitled to travel thereon, he may resist force with force; but if the conductor stops the train on his account, and undertakes to detach the mail car therefrom and send it on with the mail, he has no right to prevent him from so doing, and if he does his act is unlawful.

Information for Violation of Section 3995, Rev. St.

*James F. Watson*, for the United States.

*George Kane, in propria persona.*

DEADY, J. This is an information charging the defendant with a violation of section 3995 of the Revised Statutes, which provides that "any person who shall knowingly and willfully obstruct or retard the passage of the mail, or any carriage, horse, driver, or carrier, carrying the same, shall, for every such offense, be punishable by a fine of not more than $100." The defendant pleads "not guilty," and submits the case to the judgment of the court on the facts stated in the deposition of the witnesses, including his own, examined before the commissioner who committed him to answer the charge, and which, by the stipulation signed by the district attorney and the defendant, is to have the effect herein of a special verdict. From this it appears that on January 10, 1884, there were at Pendleton, Oregon, about 150 discharged railway laborers, including the defendant, who had lately been employed by contractors in the construction of a railway in that vicinity, and wanted to come to Portland on the regular train of the Oregon Railway Navigation Company, then running between Pendleton and Portland, and carrying, among other things, the United States mail, without paying their passage, on the ground that they were without money, and the company ought to pass them down as it had passed them up, which the conductor of the train refused to permit; that the defendant, acting as spokesman for himself and the crowd, told the conductor that the train should not move without them, and that if he undertook to pull out and leave them behind, there would be trouble, and he would be hurt; that thereby the train with the United States mail in the postal car was detained at Pendleton until the next day, January 11th, when the conductor concluded and undertook to cut off the postal car containing the United States mail, then being carried thereon from Pendleton to Portland, and proceed with it to the latter place, as it was his duty to do, but the defendant forbade him to do so, and told him there would be trouble if he attempted to uncouple the car; and when the conductor, notwithstanding the threat, undertook to have the pin removed, and the mail car detached from the rest of the train for the purpose of proceeding with it to Portland, the defendant, backed by several of his associates, prevented the brakeman from taking out the pin, by putting his foot upon it, and threatening violence if the attempt was persisted in; but also, according to his own statement,

saying that the conductor might take "his mail, but if the train goes we are' going with it," whereby the passage of said mail, mail carriage, and carrier, was further obstructed and retarded until the arrival on the ground of a detachment of United States soldiers, and the arrest of the defendant by the deputy United States marshal.

In the case of *U. S.* v. *Kirby*, 7 Wall. 482, the defendant was charged with arresting the carrier of the mail, and detaining the steam-boat on which it was being carried for that purpose. The defendant, in his plea to the indictment, alleged that he made such arrest as sheriff, upon a lawful warrant charging the carrier with murder, and without any intent or purpose to obstruct the mail or the passage of the steamer. Upon a demurrer to this plea, the judges in the court below were divided in opinion as to whether the conduct of the defendant constituted, under the circumstances, an obstruction of the mail within the meaning of the act of congress, and certified the question to the supreme court. The court answered the question in the negative, saying, "that the act of congress which punishes the retarding or obstruction of the mail or of its carrier, does not apply to a case of a temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder." In the course of his opinion, Mr. Justice FIELD says, substantially, that the statute only applies to persons who do some act with a knowledge that it will retard the passage of the mail and do it with that intention, but adds: "When the acts which create the obstruction are in themselves unlawful, the intention to obstruct will be imputed to their author, although the attainment of other ends may have been his primary object."

That the conduct of the defendant and his associates had the effect to obstruct and retard the passage of the mail is self-evident; and that this effect was knowingly caused by them, although it was not the primary object of their action, is also plain enough. They directly and purposely obstructed the passage of the mail, not as an end, it is true, but as a means of coercing the conductor to carry them on his train to Portland. I suppose the passage of the mail is seldom obstructed, except by robbers, otherwise than as a means of attaining some other end. In all such cases the question to be decided is whether the act causing the obstruction is in itself lawful? If it is, the obstruction necessarily caused thereby is not a crime. It can hardly be pretended, upon the facts stated, that these men who stopped this train had any legal right to travel thereon without payment of their fare or the consent of the conductor. No contract, understanding, or usage is alleged or shown, under or by virtue of which they could claim such a privilege with a shadow of right. Because, as they allege, the company "passed them up," they claimed it ought to "pass them down." There is an old adage that "one good turn deserves another," but this application of it would make the doing of good works dangerous to the doer. How long would it be before they

would stop an ascending train on the ground that they ought to be "passed up again" because they had been "passed down." The act of detaining the train, including the mail car, was unlawful, and therefore the intention to retard the passage of the mail by such act is imputed to the defendant and his associates. In other words, the law holds them responsible for the necessary consequences of their unlawful conduct, without reference to the motive or purpose which actually induced it. But even supposing that they had, at the time, a legal right to transportation on this train free of charge, or had even paid for their passage to Portland thereon, the act was unlawful.

Under such circumstances it may be admitted that the defendant would have a right peacefully to board the passenger car and to remain there until he reached his destination. If the conductor disputed his right and sought to put him off, he might lawfully resist force with force; and if the conductor chose to detain the train at any point until he got off, and the passage of the mail was thereby retarded, the responsibility therefor would lie at the door of the company, and not the defendant. But in my judgment, the defendant, even under those circumstances, would not be justified in preventing the conductor from detaching the mail car from the train and sending it on to its place of destination; and this is what the defendant and his associates did on January 11th. The railway company, it should be remembered, was under an obligation to carry the mail without delay as well as the defendant. And however derelict it may have been in the performance of the latter obligation, the defendant was not thereby authorized to prevent the company from doing what it could to keep its contract to carry the mail for the purpose of thereby coercing a performance of its supposed obligation to him. In the case of a mail-carrier, or a person on board a mail carriage, charged with the commission of a crime, it may be absolutely necessary to temporarily obstruct the passage of the mail to secure the arrest of such carrier or person. But the arrest of those persons, under the circumstances, is a lawful act, and the temporary inconvenience caused thereby is submitted to rather than that persons guilty of serious crimes should escape punishment. One public convenience yields something to another. But it is not only unlawful, but riotous, to prevent, as the defendant and his associates did, the passage of a locomotive drawing a mail car with the United States mail therein for the mere purpose of constraining the person charged with the conduct thereof to do or refrain from doing some act collateral thereto, and which he may even be under a legal obligation to do or omit. If the railway company was under any legal obligation to carry these men to Portland, and refused or failed to do so, the law gave them the same remedy for this breach of contract that it does other people. But it did not give them any right to coerce the company by preventing it from carrying the mails according to con-

tract until it should acquiesce in their demand, to the great hindrance, inconvenience, vexation, and possible loss of the public. The transmission of the mail from place to place throughout the civilized world with certainty and celerity is one of the greatest and most useful labors of modern society. And it cannot be admitted for a moment that a great overland link in this endless chain of communication and intelligence can be broken for days to allow a mob of discharged railway laborers to coerce a railway company into giving them a free ride of 200 or more miles.

In contemplation of law, upon the facts stated, the defendant is guilty as charged in the information. The maximum punishment for this offense is only $100 fine. Why so serious a matter as this may be, is so limited in punishment, as compared with other crimes of no greater moral turpitude or inconvenience to the public, it is impossible to say. But taking this measure of punishment for my guide, and considering that the defendant has practically declined to make any contest in the premises, he is sentenced to pay a fine of $25 and to stand committed to the jail of this county until the same is paid or he is by law discharged therefrom.